Filed 4/21/21  Joanna M. v. Superior Court CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| JOANNA M.,<br><br>Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF FRESNO COUNTY,<br><br>Respondent;<br><br>FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Real Party in Interest. | F082257<br><br>(Super. Ct. Nos. 17CEJ300167-1, 17CEJ300167-2, 17CEJ300167-3, 17CEJ300167-4, 17CEJ300167-5, 17CEJ300167-6, 17CEJ300167-7)<br><br><br>**OPINION** |

**THE COURT**[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Brian M. Arax, Judge.

William Fearnside for Petitioner.

No appearance for Respondent.

Daniel C. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

[*]    Before Meehan, Acting P.J., Snauffer, J. and DeSantos, J.

Petitioner Joanna M. (mother) seeks an extraordinary writ from the juvenile court's orders terminating her reunification services at a contested and combined six-, 12- and 18-month review hearing and setting a Welfare and Institutions Code section 366.26 hearing[1] on May 5, 2021, as to her seven children who range in age from two to 16 years of age. Douglas M. (father), mother's husband and the father of the youngest six children, also filed an extraordinary writ petition in our case No. F082255 currently pending in this court. Mother contends the court erred in terminating reunification services because the Fresno County Department of Social Services (department) failed to make reasonable efforts to assist her in reunifying with the children. We deny the petition.

## PROCEDURAL AND FACTUAL SUMMARY

*Protective Custody*

On May 7, 2019, Fresno Police Department officers responded to a motel because Michaela M., mother's then six-year-old daughter, was found wandering near a busy street unsupervised and had stopped traffic by attempting to walk out into the street. Fourteen-year-old Sophia had been charged with taking care of Michaela and their five siblings, 11-year-old D.M., eight-year-old K.C.M., four-year-old K.L.M., three-year-old K.B.M., and 10-month-old K.A.M. The children lived in a motel room with mother and father[2] and two dogs. It was the second time the police had been called under the same circumstances. A referral was made to the department and a social worker responded to the motel room.

When the parents arrived at the motel, over an hour after the initial call, mother said she and father had gone to bid on a job. He was a construction worker and she was

---

[1]    Statutory references are to the Welfare and Institutions Code.

[2]    Father is the presumed father of all the children except Sophia. The whereabouts of Sophia's alleged father, Marcus S., were unknown throughout the proceedings.

his bookkeeper. She said she never left the children alone and that this was only the second time. She tried to call a friend to help them with babysitting but guessed her friend did not show up. She said she only left Sophia in charge of the children once a week. She maintained communication with Sophia the entire time she was gone. She also provided Sophia a child safety lock to put on the motel door to keep the children from leaving but Sophia did not use it.

Mother reported the children were healthy. Eleven-year-old D.M. was possibly autistic but high functioning. Michaela was very active and had behavioral problems. Mother homeschooled the children that were of school age but had not registered them with any school for their curriculum. Sophia said they had not received any instruction during 2019. Mother denied any substance abuse, domestic violence or involvement with law enforcement. However, she admitted she and father smoked marijuana after the social worker asked them to drug test.

The children were taken into protective custody and placed in foster care. The older children stated the parents left them in Sophia's care for five to six hours every day while they were out looking for work or doing other things. Sophia, eight-year-old K.C.M. and six-year-old Michaela reported domestic violence in the home in the form of yelling, cursing and pushing. Sophia said her parents were "very odd together." As an example, they hung a blanket and had sex in the hotel room next to her and her siblings.

The following day, Michaela's foster mother reported she was overwhelmed with Michaela's behavior and could no longer care for her. Michaela swung at and kicked her and attempted to bite her. She threatened to drop things she picked up around the house and attempted to leave the house several times, requiring the foster mother to sleep in her hallway. The other children said that was Michaela's normal behavior. A few days later, Michaela was involuntarily detained under section 5150 and admitted to a pediatric psychiatric facility where she was diagnosed with suicidal ideation, bipolar disorder, schizophrenia and insomnia. She was violent toward the nurses and self-harming. After

3.

approximately two weeks of hospitalization, she was discharged and transported to a short-term residential therapeutic program (STRTP) where she received mental health treatment.

On May 9, 2019, the department conducted a team decision meeting. The parents were late because they stopped to drug test on their way. However, they refused to be observed urinating and left without being tested. Father informed the social workers the urinalysis and the meeting were a waste of his time and left. Mother remained and agreed to test by hair follicle analysis. The social workers determined voluntary family maintenance services were not appropriate because of the high risk to the children's safety and the parents' inability to make a safety plan.

*Detention*

The department filed a petition on behalf of all seven children, alleging they came within the juvenile court's jurisdiction under section 300, subdivision (b)(1) because the parents failed to supervise them, provide adequate food, shelter and medical attention and endangered them by engaging in domestic violence and abusing substances.

The detention hearing was conducted on May 10, 2019. The parents appeared with counsel and denied the allegations. After neither party stipulated to detention and mother disputed facts in the report, the juvenile court set a contested detention hearing for May 16. However, neither parent appeared at the contested hearing, and the juvenile court did not find good cause to continue it. The court ordered the children detained and ordered the department to offer the parents parenting education, substance abuse, domestic violence and mental health assessments, any treatment recommended from the assessments and random drug testing. The court also ordered reasonable supervised visits for the parents and ordered them to participate in a hair follicle test. The court set the jurisdictional hearing for June 4. Father subsequently refused to discuss the case with the social worker assigned their case, Frank Maldonado-Montez (Montez), because he and mother believed the children would be returned to them at the June 4 hearing.

4.

On May 13, 2019, the parents moved to Stanislaus County and were living in a van parked in the backyard of the paternal grandmother's residence in Oakdale. They visited the children at the child welfare office in Fresno. During a visit on May 14, 2019, mother criticized and blamed Sophia for the removal of her siblings. Mother said, " 'You got what you wanted' " and " 'I am glad Michaela is acting up so I can say Ha Ha, now the kids will have to be returned to me.' " Sophia believed the children's removal was her fault and she was the problem in the family because she did not care for them properly. On May 29, Montez requested the parents be placed on the waiting list for therapeutically supervised visits.

*Child Welfare and Criminal History*

The parents have child welfare history in Lake County. In March 2011, father's daughter, K.M., was removed from his custody because he was neglecting her mental health needs and there were allegations mother was physically abusing her. K.M. was diagnosed with reactive attachment disorder, posttraumatic stress disorder, obsessive-compulsive disorder and major depression with psychotic features. She was taken from the home because she had suicidal ideations and heard voices telling her to hurt her younger siblings. Father was ordered to participate in mental health services and parenting classes but did not and blamed K.M. for her behavior. He did not visit her and moved to Hawaii with mother and their six children during the dependency. In July 2012, the court terminated reunification services and ordered K.M. into long-term foster care. At the time of these proceedings, she was a nonminor dependent in Lake County.

Mother had child welfare history in St. Louis, Missouri where her son Donovan and daughter Kyra were placed under " 'courtesy supervision' " by the juvenile court. In 2000, they were placed in a legal guardianship with their paternal grandparents. They were adults at the time of these proceedings. Mother was convicted in Sonoma County of felony grand theft in 2008 and sentenced to 36 months of probation.

5.

*Jurisdiction*

The parents appeared at the jurisdictional hearing on June 4, 2019. The department requested the juvenile court find the allegations in the petition true and set a dispositional hearing in 30 days so the department could assess whether any of the bypass provisions for reunification services applied to the parents. The court set a contested, combined jurisdictional and dispositional hearing for September 9.

The parents expressed their objection to the children's removal. Father claimed the supervising police officer overstepped his power and did not let the dispatched officer do his job. He said the supervising police officer was not a detective and lacked the authority to make the judgment call. In addition, the supervising officer separated him and made it seem like he was being confrontational. He was only exercising his right to freedom of speech. Mother objected that the decision to remove the children was not made while she and father were present. The children had food, clothing and shelter and there was no evidence of abuse or drug use. She refused to submit to a hair follicle test because her attorney advised against it.

On June 28, 2019, Sophia was taken to a children's hospital after it was discovered she had cuts on her arms. She was involuntarily detained (§ 5150) and admitted to a psychiatric facility. The day before she visited with her parents. Before she arrived, father was telling the social worker it was Sophia's fault that the children were removed. It upset him that he had to file criminal charges against his own daughter for making false allegations against him. Mother made comments implying that Sophia was participating in sex trafficking and father gave her an ultimatum about placement. After the visit, Sophia felt like harming herself. On July 2, 2019, she was discharged and placed in a foster home.

During a child and family team meeting on June 28, 2019, mother agreed to participate in the assessments offered by the court if they could be arranged during the days that she visited the children. She also agreed to participate in a hair follicle test but

6.

failed to show for the test. Father refused to participate in the meeting because the social workers would not allow his dog to attend.

On July 12, 2019, father stated the department could not make him do services because they were not court ordered. He planned to sue the department for removing the children. He threatened Montez, stating he was going to make his life a " 'living hell' " if he did not return the children to him. He alleged the department and the court were colluding and doing " 'illegal stuff.' " Mother asked that her services be provided through Stanislaus County, stating she did not want to participate in services in Fresno County.

On July 29, 2019, Montez drove to Oakdale to verify the parents' residence. He knocked on the door and rang the doorbell several times over a 20-minute period. Montez believed there was someone in the home because he could hear the television and the sound of someone inside moving things, but no one answered the door.

On August 12, 2019, the department filed a modification petition under section 388 asking the juvenile court to suspend visitation between Sophia and her parents. The parents blamed Sophia for the removal of the other children and refused to drug test before visits to demonstrate they were sober. Sophia told the social worker her parents' behavior caused her stress. She felt embarrassed and ashamed at times. She did not want to continue visits with her parents for the time being and did not want to reunify with them. At a hearing on the petition on August 22, the court suspended the parents' visitation with Sophia.

*Disposition*

In its dispositional report, the department reported the parents refused to participate in services until ordered by the court. They were scheduled to participate in substance abuse, mental health and domestic violence evaluations but did not keep the appointments. They were on a waiting list for a parenting class and did not register to drug test. Mother wanted to participate in services in Stanislaus County but had not

7.

verified residency there. The parents visited the children but missed some visits because they lived in Oakdale and did not have money for gas. On several occasions, they refused to return the children to their caregivers and argued with departmental staff in front of the children. Father was disrespectful, demanding and threatening to departmental staff.

The department recommended the juvenile court provide mother reunification services but deny father services under section 361.5, subdivision (b)(10)[3] because of his failure to reunify with K.M. Given the circumstances under which K.M. was removed, the department did not believe father made subsequent efforts to treat his children's mental health problems. It opined it would not be in the children's best interests to provide him reunification services.

Neither parent appeared at the contested, combined hearing on September 9, 2019. They were then living in Modesto. Montez told the juvenile court that the parents had been difficult. They were emotionally unstable and erratic. They called him at all hours of the day; at 2:00 a.m., 4:00 a.m., 10:00 p.m. Their demeanor changed abruptly from happy and grateful to profane. They sent emails to Montez, their attorneys, and the deputy director and director of the department, making false allegations against him. They followed and harassed the care providers which resulted in a change of placement and separation of the children. Their speech was slurred sometimes and "overly energized." The court noted that there were also concerns about transiency stemming from the case in St. Louis, Missouri.

---

[3]     Section 361.5, subdivision (b)(10) provides that reunification services need not be provided if the juvenile court finds by clear and convincing evidence that the court ordered termination of reunification services for any sibling or half sibling of the child because the parent failed to reunify after the child had been removed from his or her custody and the parent has not subsequently made a reasonable effort to treat the problems that led to the removal of the sibling or half sibling.

8.

The juvenile court adjudged the children dependents under section 300, subdivision (b)(1). The court declined to bypass father for services and ordered the parents to participate in the services offered at detention. The court also ordered them to participate in psychological evaluations. The court questioned their ability to benefit from services, father because he was "[h]ighly angry and volatile," "[e]rratic to the point of bizarre" and mother because she was controlled by him. The court granted the department's section 388 petition suspending visitation with Sophia, specifically finding that visitation was detrimental but noting it was temporary pending Sophia's participation in mental health services and the parents' engagement in services. The court granted the department discretion to advance visitation for the other children to unsupervised and/or therapeutic supervised up to extended visitation with a 10-day notice. The court set the six-month review hearing for March 3, 2020.

Mother appealed the jurisdictional findings and dispositional orders, which were affirmed. (*In re S.S. et al.* (Aug. 24, 2020, F080123) [nonpub. opn.].)

*Initial Six Months of Services*

On October 30, 2019, Montez drove to Modesto to verify the parents' residence there. He observed the house was boarded up and several documents were posted on the window. A neighbor approached and told Montez the parents broke into the house a few months before in the middle of the night. They were up at all hours of the night and he knew they were not the owners of the house. The bank had foreclosed on the house. He and other neighbors were concerned because of the foot traffic in the house, the constant screaming and the fact that the parents were up all night. There had been several incidents of domestic violence at the house and one night mother ran from the house screaming for help. The police were called, and the parents were arrested.

On November 5, 2019, the juvenile court conducted a disposition mediation hearing. The parents did not participate in the mediation. They were living in Merced. County counsel informed the court that mother violated the court's order not to contact

Sophia. On October 10, the department was informed that the parents participated in a discussion with a radio talk show host about the case. The discussion lasted approximately an hour and they discussed Sophia in detail. Mother sent Sophia the link to the radio broadcast by social media. Sophia was very upset by the incident. County counsel also informed the court of Montez's trip to Stanislaus County to verify their address and the discussion with the neighbor.

The juvenile court addressed the issue of transferring the case to Stanislaus County, stating that the case would remain a Fresno County case until the parents presented evidence that they established a stable residence in another county.

On January 15, 2020, Montez presented the parents a services plan, which included services for father. The parents refused to sign it.

The department recommended the juvenile court terminate reunification services at the six-month review hearing. The parents had not participated in any of their services despite multiple referrals, meetings and telephone and email communications from May 2019 to February 2020. They visited the children but inconsistently, missing visits every month because of work, car trouble and not having money for gas. In addition, they had not progressed beyond supervised visitation because of their inappropriate behavior. Twice they refused to allow the children to leave with their caregivers. At the end of a visit on June 27, 2019, the parents refused to let the one year old go for about 10 minutes. As Montez and another social worker were getting into their car, the parents yelled that they were going to sue Montez and the department. Father stated, they " 'f***** with the wrong person' " and should not " 'have messed with my kids.' " At a prior visit that same month, father claimed that Montez received $363.00 per child on his caseload. On August 7, 2019, the parents began therapeutically supervised visits and were transitioned to intensive supervised visits on October 2, 2019.

There were also concerns the parents were engaging in domestic violence. Mother disclosed being physically abused by father and attended visits with visible injuries.

10.

According to the children, the parents sought information on their whereabouts and despite a no visitation order, mother continued to try to reach Sophia through social media and tried to bribe her to visit and to live with her.

Although the parents requested many times to have their case transferred to Stanislaus County, they did not establish their residency there. Mother also made informal requests that their case be transferred to Madera County, Merced County and Lake County.

Meanwhile, the children were doing well in their placements and the department secured a plan of adoption for six of the seven children. Fifteen-year-old Sophia was placed separately in a foster home. She was maintaining average to above average grades, was on the high school's basketball team and involved in gymnastics. Twelve-year-old D.M. was separately placed. He was on the school wrestling team and making progress in his academics. Seven-year-old Michaela was in a STRTP. She was doing well in school and had been recognized several times for being an outstanding student. Her behavior was under better control and she had not been involuntarily detained since May 2019. Nine-year-old K.C.M. and five-year-old K.L.M. were placed together and making improvements in their education. Four-year-old K.B.M. and one-year-old K.A.M. were placed together and making great strides in their development.

On March 3, 2020, the juvenile court continued the six-month review hearing and set it as a contested hearing on June 23, 2020.

*Review Hearings Continued and Combined with Modification Petitions*

On April 24, 2020, Montez applied for a restraining order against mother, asserting she and father continuously harassed him over the prior 10 months. The harassment included filing false police reports against him, filing false sexual harassment complaints against him with his employer and making indirect threats, such as " '[Y]ou are going to get yours' " and " '[Y]ou will be sorry if I don't get my kids back.' " More recently, she attempted to obtain his personal information and posted it on her YouTube

channel, Mommy of Nine. She also directed people to show up at his house and said she was no longer playing around. Her attorney was contacted and facilitated trying to get the video taken down, which resulted in it being made private but it was still available to some people on YouTube. She also stated on YouTube that she had the names and addresses of the children's foster parents. A few weeks after she posted the information, the parents and their acquaintances showed up unannounced at the foster homes. Montez felt insecure in his home and had trouble sleeping.

On May 5, 2020, the juvenile court admonished mother not to have any unauthorized contact with the children or discuss the case outside of court proceedings. The court also ordered her to remove the video by 5:00 p.m. that day and ordered the parties to disclose any of mother's missed visits. Montez's request for a restraining order was denied.

On May 11, 2020, the department filed a section 388 petition asking the juvenile court to suspend the parents' visitation with the remaining children because the parents' behavior placed them at risk. The hearing on the petition was set for June 23, 2020.

On June 3, 2020, mother's attorney filed a statement of contested issues, raising the issue whether mother was provided reasonable reunification services considering Montez's repeated sexual advances. In mother's affidavit attached, mother stated she and father separated during the proceedings but planned to resume living together by June 1, 2020. Beginning in August 2019, Montez made inappropriate sexual advances toward her. He got very close to her, hugged her and rubbed her bottom. He told her she was beautiful, intelligent and too good for father and asked her to see him without father present. He called her " 'honey' " and " 'sweetie.' " Montez promised to help her regain custody of the children if she "played along." When she did not, he retaliated by reducing the frequency of visits. She attempted to report his behavior, but no one returned her calls and emails. In May 2020, Cheryl O'Connor, Montez's supervisor,

12.

received a formal complaint. The parents' case was transferred to another social worker in July 2020.

On June 12, 2020, Donovan (adult brother) filed modification petitions for each child, asking the juvenile court to place the children with him until they reunified with their parents. He stated Kyra (adult sister) was relocating to live with him and help care for the children. The court summarily denied the petitions because Donovan did not establish new evidence or a change of circumstances.

On June 23, 2020, a new judicial officer convened the contested hearing on the department's section 388 petition and the six-month review of services. Prior to the hearing, mother disqualified the commissioner previously assigned the case. Mother did not appear at the hearing. She was out of state caring for Kyra, who had surgery. The juvenile court continued the hearing to August 18, 2020, as a contested six- and 12-month review/section 388 hearing. The court also conducted a *Marsden*[4] hearing and appointed new counsel for father.

On July 24, 2020, father's attorney filed a statement of contested issues, arguing the department's failure to establish father's residence in Stanislaus County and provide him services there was unreasonable. Father asserted Montez's visits to his home were not a meaningful effort to verify his residence. Montez could have confirmed his residence by requesting his utility bill information or dated mail. Father also informed the juvenile court he and mother were living in Mariposa and asked to have the case transferred there.

On July 6, 2020, mother completed assessments for domestic violence, substance abuse and parenting through Court Ordered Programs Inc. Mother was not forthcoming about her history. She disclosed being arrested for trespassing in October 2019 but did not mention her felony conviction for grand theft. She denied any substance abuse

---

[4]     *People v. Marsden* (1970) 2 Cal.3d 118.

despite the children's statements they suspected she was using drugs. Given mother's refusal to participate in mandatory drug and alcohol screening tests, irresponsible behavior regarding alleged drug use, having sexual intercourse in front of the children and inability to maintain employment, it was recommended she complete a 52-week domestic violence program, a one-year substance abuse treatment program, a 52-week parenting program and a psychological evaluation.

On July 29, 2020, the juvenile court conducted a settlement conference on the combined hearing and appointed new counsel for the parents. The court confirmed the contested six- and 12-month review/section 388 hearing for August 18. The case was assigned to a new commissioner.

After father moved to disqualify the new commissioner and refused to stipulate to her hearing the case, the matter was continued to January 5, 2021, and set as a contested six-, 12- and 18-month review/section 388 hearing.

On August 27, 2020, mother completed a domestic violence assessment through Logan Social Services, a division of The Logan Group Int. (Logan Group). It was recommended she complete an eight-hour domestic violence program. On September 14, mother completed the eight-hour domestic violence program and a 52-hour parenting course through Logan Group. On September 15, 2020, father completed a four-hour anger management course and an eight-hour parenting course through Logan Group.

On September 21, 2020, mother's attorney filed a section 388 petition requesting supervised written contact with Sophia and conjoint counseling. A hearing on the petition was scheduled on January 5, 2021.

The department maintained its recommendation the juvenile court terminate reunification services. The parents were uncooperative and violated the court's orders. The children continued to do well in their foster care placements.

*Combined Review and Section 388 Hearing*

On January 5, 2021, the juvenile court conducted the first review hearing in the case. Twenty months had passed since the children were taken into protective custody. The parents had lived in five counties. They had not participated in any services in Fresno County. Over the course of three court sessions, the court heard testimony about the reasonableness of services. Montez, O'Connor, the parents and Sharri M., the maternal grandmother, testified.

*Testimony of Montez*

Montez was aware the parents were homeless, and that housing was a problem. He did not offer them housing in Fresno because the department had limited resources. Once the department established the parent was living in another county, it could transfer the case to the other county if the change in residence was long term or coordinate with the other county to provide services. However, the parents never established residency in another county. Montez did not inquire about services in Stanislaus County but recommended the parents seek them on their own. He arranged for them to participate in their assessments when they visited the children in Fresno, but they did not complete them. After March 2020, services and visitation were available to the parents remotely.

Montez referred the parents for in-person parenting classes in May or June 2020. Father did not enroll. Mother enrolled in the class but did not attend.

Montez was aware the parents had transportation problems. They had a car but did not have money for gas sometimes. The department can provide gas vouchers with the proper documentation, which the parents did not provide. Montez did not offer them a Greyhound bus ticket because they had a car and he did not think to offer it. The parents' primary goal in asking for gas vouchers was for visitation and not to participate in services.

Montez denied sexually harassing mother stating, "Never, all of her statements were completely false."

15.

*Testimony of Cheryl O'Connor*

O'Connor testified the case could have been transferred to Stanislaus County while the parents were living there but they never provided sufficient evidence they had a stable residence for the department to request a transfer of the case. Had the parents been more cooperative with Montez and the department and identified their residence, the department may have offered them services in another county.

O'Connor received an email from mother on July 2, 2020, stating she completed all her services and directed the department make decisions on her case. However, the department had not vetted the services in terms of their content and duration. The department tried to help mother identify services that were approved but she was not interested. She wanted services she could pay for and she did not trust the department. The department attempted to assess the services mother completed but was unable to assess father's services because he did not provide a release of information. Mother provided a certificate showing father completed an eight-hour parenting class, but a 12-hour class was required. Mother also provided a certificate showing father completed a course in anger management. O'Connor did not believe mother wanted to participate in services.

O'Connor contacted Mariposa on December 2, 2020, to inquire about services. A social worker from that county attempted to contact the parents but could not reach them after multiple attempts. Mariposa County offers the services the parents need. All the services the parents needed except for random drug testing and possibly domestic violence were online.

Father's case plan was created after the dispositional hearing. The plan required him to complete programs in domestic violence and parenting, complete a substance abuse assessment and participate in general counseling and random drug testing. Father was told what services he had to complete and refused several times to comply.

16.

*Mother's Testimony*

Mother testified she and father lived in Mariposa County for the prior 10 months. She provided a printout to the department showing she was living in a motel in Merced. She provided a bill from Modesto Irrigation showing she was living there. She lived in Fresno from February to March 2020 but did not drug test because she did not have a referral. Montez offered her remote parenting services after the pandemic but did not give her the link. She found services online and completed a 52-hour parenting class and an eight-hour domestic violence class. She did not believe she needed to complete a substance abuse assessment. She only needed mental health treatment to deal with the dependency case. Regarding the recommendation she complete a yearlong substance abuse treatment program, she claimed it was based on information provided by the department which was "90 percent false."

Mother attended nearly every visit, adding that she earned her Ph.D. in sociology during the reunification period.

*Father's Testimony*

Father was employed and had a stable home. He maintained that the children were removed from him unlawfully and should be returned to his custody immediately. He did not need services. He wanted the case transferred to another county and reevaluated. He was willing to work with any county other than Fresno County, including Mariposa County. Father inquired about services in Stanislaus County but the social services agency there would not provide them without a referral. He claimed Montez enrolled him in services without telling him. Montez testified he sent a services letter to the parents every time he enrolled them in a service and called to let the parents know or left them a voice message.

*Testimony of Sharri M.*

Sharri M. emailed Montez in early January 2020 asking him to transfer the case to Lake County so that she could help mother. Montez called her and said mother could

17.

have her attorney file something but that it was too late. Sometime after February 2020, Sharri M. received at her address a packet of materials for an online parenting course addressed to mother. Sharri M. scanned the information and emailed it to mother. Mother later told Sharri M. she was not able to complete the program because they did not give her the link.

*Argument*

County counsel argued the parents chose not to reside in Fresno or participate in services there. They never established a residence that would allow for the transfer of the case to another county. Their motive in transferring the case was to convince another department that the children should be returned to their custody without services. Minors' counsel joined in county counsel's argument. Counsel for the parents argued the parents were not provided reasonable reunification services because there were obvious barriers to reunifying—i.e., housing and transportation—which the department failed to adequately address.

*Ruling*

On January 11, 2021, the juvenile court found by clear and convincing evidence the department provided the parents reasonable reunification services, stating the parents' behavior presented "tremendous challenges." The court found mother's progress was minimal to moderate and father's progress was minimal and that it would be detrimental to the children to return them to parental custody. The court terminated reunification services. The court denied the section 388 petitions filed by mother and the department. The court suspended visitation with Sophia, finding it remained detrimental to her. The court ordered reasonable supervised letter and gift exchange and telephonic visitation with the other children. The court ordered no social media exchange with any of the children. The court set the section 366.26 hearing for May 5, 2021.

18.

## DISCUSSION

Mother contends lack of transportation and living out of county were barriers to reunifying with the children. The department's failure to assist her by transferring the case to the county where she was living, she argues, was unreasonable and necessitates remanding the case for further services. We disagree.

*Reasonableness of Reunification Services*

Dependency proceedings have the dual purpose of protecting the welfare of the dependent child and safeguarding the parent's right to properly raise their own child. (*In re La Shonda B.* (1979) 95 Cal.App.3d 593, 599.) If the child is removed from parental custody, the primary objective is to reunify the child with his or her family. (§ 202, subd. (a).) "The foundation and central, unifying tool in child welfare services is the [reunification] plan. The [reunification] plan must provide for the child's care and case management and must provide services that facilitate both return and, concurrently, permanency." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2020 ed.) Disposition Hearing, § 2.129[4].)

Reunification, however, is not an open-ended process. Consequently, the dependency statutes place a limit on its duration and require the juvenile court to monitor its progress by conducting periodic review hearings at six-month intervals. (§§ 361.5, subd. (a), 366, subd. (a)(1).) In general, services are limited to 18 months from the date the child was originally removed from parental custody. (§ 361.5, subd. (a)(3).) The children were initially removed from parental custody in May 2019, making January 2021 the 20th month.

The purpose of reunification services is to place the parent in a position to regain custody of the child. (*In re Karla C.* (2010) 186 Cal.App.4th 1236, 1244.) To that end, the department must devise a reunification plan tailored to the unique needs of the family and make a good faith effort to help the parent access the services the plan provides. (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) "The adequacy of reunification plans and

19.

the reasonableness of the [department's] efforts are judged according to the circumstances of each case." (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.) "To support a finding reasonable services were offered or provided, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult .…' [Citation.] 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426.)

*Standard of Review*

"When a finding that reunification services were adequate is challenged on appeal, we review it for substantial evidence." (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971.) In so doing, "we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) The juvenile court's finding that reasonable reunification services were provided must be made upon clear and convincing evidence. (§ 366.21, subd. (g)(1)(C)(ii).) When the juvenile court is required to apply the clear and convincing standard of proof, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

*Substantial Evidence Supports the Juvenile Court's Reasonableness Finding*

In light of the allegations in the petition, the department adopted a reunification plan for mother designed to ensure the children's safety and address potential problems of substance abuse and domestic violence. Mother was provided with parenting classes,

20.

substance abuse, mental health and domestic violence assessments, any services identified in the assessments and random drug testing.

Within days of the children's initial removal in May 2019, mother and father left Fresno County. Over the ensuing 20 months, they relocated many times across five counties. They were aware that the transfer of their case to another county depended upon them providing proof of residence and initiating services. Montez and a social worker from Mariposa attempted multiple times to verify their addresses without success. However, the parents were uncooperative and did not make themselves available. It is clear by their conduct and testimony they had no intention of participating in any services coordinated by the department.

Further, mother and father wanted to pick and choose which services they would participate in and to what depth. Mother found two online providers of services, Court Ordered Programs Inc. and Logan Group. She completed the 52-hour parenting class recommended by Court Ordered Programs Inc. but declined to follow its recommendations she complete a 52-week domestic violence program, one-year substance abuse program and a psychological evaluation, opting instead to complete Logan Group's eight-hour domestic violence class and disregard completely the substance abuse program and psychological evaluation. When questioned about the one-year substance abuse treatment program, mother claimed the evaluators relied on false information provided by the department. However, at no time did mother rebut information provided by the department in its reports.

There is always more that the department can do to assist parents in the reunification process. However, the question is whether the efforts the department did make were reasonable under the circumstances. We conclude that they were.

The parents were convinced Fresno County wrongfully removed the children from their custody. Their goal was to regain custody of them without participating in services. If they had to participate in services, they would be of their own choosing without any

21.

regard for whether the services satisfied their case plan requirements. Aside from attempting to verify their residence and direct them to available services, there is not much else the department could have done given the parents' transience and refusal to cooperate.

Further, there is no evidence the parents would have cooperated with another county had their case been transferred or had the department arranged services through a different county. There were justifiable concerns the parents were engaging in domestic violence, abusing substances and suffering from mental health problems. They, however, denied having such problems. Consequently, there is no reason to believe they would have been willing to address these issues even under the supervision of another county agency.

We conclude substantial evidence supports the juvenile court's reasonable services findings and find no error.

## DISPOSITION

The petition for extraordinary writ is denied. This court's opinion is final forthwith as to this court pursuant to California Rules of Court, rule 8.490(b)(2)(A).